**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MOHAMMAD MIAN and** | : |
| **SAJIDA GHIAS T/A** | |
| **PEREZ GROCERY** | : |
| | |
| **Plaintiff,** | : |
| | |
| **v.** | :   **Civil No. WDQ 14-2820** |
| | |
| **UNITED STATES OF AMERICA,** | : |
| | |
| **Defendant.** | : |

...o0o...

<u>MEMORANDUM OF LAW IN SUPPORT OF</u>
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant United States of America, by the undersigned counsel, respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiffs filed this action seeking judicial review of the decision of United States Department of Agriculture ("USDA" or "Agency") to disqualify them from further participation in the Supplemental Nutrition Assistance Program ("SNAP").  The SNAP, previously known as the Food Stamp Program, is administered by the USDA's Food and Nutrition Service ("FNS").  *See* 7 C.F.R. § 271.3.  As the administrative record reflects, the Agency found ample evidence drawn from the record of transactions at Perez Grocery to support the Agency's determination that Plaintiff was engaged in trafficking.  The Food Stamp Act and SNAP regulations require the FNS to disqualify permanently stores that have engaged in trafficking; therefore, the Agency's decision, based on the record evidence, was neither arbitrary nor capricious.  Accordingly, this Court should grant summary judgment in favor of Defendant.

## II.    FACTS

Plaintiffs, Mohammed Mian and Sajida Ghias, ("Plaintiffs"), are the owners of Perez Grocery, (the "Store").    They seek to appeal the permanent disqualification from the Supplemental Nutrition Assistance Program ("SNAP") which was imposed following an administrative determination that the Store had trafficked in SNAP benefits in violations of the statute and regulations governing.    Trafficking is defined in 7 C.F.R. § 271.2.  The penalty for trafficking in SNAP benefits is permanent disqualification from SNAP upon the first occasion of trafficking.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).  Plaintiffs request review of the administrative decision of the Food and Nutrition Service ("FNS" or the "Agency").    See Complaint, ¶ 2.

As more fully set forth below, the court should determine that the  finding of trafficking violations and the resulting permanent disqualification were valid.  Sufficient evidence gleaned from the record of transactions at the Store and investigation by the Agency supports the Agency's determination that Plaintiffs committed violations of SNAP regulations.   FNS is required by SNAP regulations to permanently disqualify stores that have engaged in trafficking unless they meet certain criteria justifying an alternative civil money penalty, for which Plaintiffs did not qualify.  For those reasons, the court should affirm the action of the Agency.

### A.  The Supplemental Nutrition Assistance Program

The Supplemental Nutrition Assistance Program is operated by the United States Department of Agriculture ("USDA").   See the Food and Nutrition Act of 2008, 7 U.S.C. §§ 2011-2036.  The mission of SNAP is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." Id.   The program is administered by the USDA's FNS.   7 C.F.R. § 271.3. Assistance is focused on increasing the food purchasing power of eligible households by

supplementing the funds families have to spend on food with food stamp allotments, which may be used for purchasing food items at authorized retail food stores. 7 U.S.C. § 2013.

Households' SNAP benefits are now delivered through electronic benefit transfer ("EBT") cards. These EBT cards operate similarly to the automated teller machine cards used by banks. At the beginning of each month, a SNAP recipient's card is credited with a dollar amount of SNAP benefits for that month. The EBT card is then used at authorized retail food stores to purchase eligible food items. Retail food stores have one or more EBT terminals in their stores and as a purchase is made, the retailer swipes the EBT card through the EBT terminal, the recipient enters a personal identification number code on a keypad, and the amount of the purchase is deducted from the recipient's EBT card. The EBT terminal generates a receipt for each transaction and the balance remaining in the recipient's account for the month is displayed on the receipt. The amount of the recipient's purchase is then electronically credited to the retail food store owner's bank account, via previous arrangements between the store owner and FNS. Additionally, and in this case critically, FNS is able to electronically monitor stores' EBT transactions.

Pursuant to SNAP regulations, retail food store owners may not accept EBT benefits as payment for ineligible items, which are generally non-food items and some prepared hot food items. 7 C.F.R. § 271.2. They are also prohibited from exchanging EBT benefits for cash, regardless of whether the store discounts the benefits (for example, charging a customer $25 on his or her EBT card in exchange for a $20 bill). C.F.R. § 271.2.

Through the evolution of the SNAP, Congress has repeatedly emphasized the importance of combating fraud in the program. Therefore, FNS monitors stores, conducts periodic reviews of stores, and initiates investigations of stores when the Agency believes it is warranted by suspicious transaction data.

FNS is authorized to disqualify any authorized store from future participation in SNAP if the store fails to comply with the Food and Nutrition Act. Such a disqualification must be based on "a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC)." 7 C.F.R. § 278.6(a).

When an investigation results in an agency action to disqualify a store, or assess a civil monetary penalty on the owner, Title 7 of the Code of Federal Regulations at Parts 278 and 279 provide for a system of administrative and judicial review. A retailer may request administrative review by an Administrative Review Officer ("ARO"). 7 C.F.R. § 278.8; 7 U.S.C. § 2023(a)(3). If an administrative review is sought, the administrative action is held in abeyance until the ARO has made a determination, unless the penalty is a permanent disqualification for trafficking. 7 C.F.R. § 279.4. In cases of a permanent disqualification for trafficking, the disqualification action is effective from the date the firm receives notice of the disqualification. 7 U.S.C. § 2023(a)(18). Upon completion of the review, the ARO renders the final agency decision ("FAD") and notifies the retailer. 7 C.F.R. § 279.5; 7 U.S.C. § 2023(a)(5). This final agency decision becomes effective thirty days from the date of delivery. 7 C.F.R. § 279.5(f); 7 U.S.C. § 2024(a)(5).

After receiving notice of the FAD, the retailer may seek judicial review in federal or state court and the suit shall be a trial *de novo* by the court in which the court determines the validity of the administrative action. 7 U.S.C. § 2023(a)(13), (15). If the action is found invalid, the court shall enter a judgment as it determines is in accordance with the law and the evidence. 7 U.S.C. § 2023(a)(16); 7 C.F.R. § 279.7(a). The administrative action under review remains in full force and effect, unless there is an application for a stay and the court considers the

4

applicant's likelihood of prevailing on the merits and irreparable injury and the court then stays such action.  7 U.S.C. § 2023(a)(17).

B.  <u>Participation of Perez Market</u>

Plaintiffs are the owners of Perez Grocery, a convenience store located at 530 N. Kenwood Avenue, Baltimore, Maryland.  A.R. 1. [1]  The Store became an authorized SNAP retailer in 2001.  A.R. 1.  In 2013, FNS became aware of unusual patterns in the EBT data and so conducted a store visit and a more thorough review of the Store's data for the months of July, August, September, October, November, and December of 2013.  A.R. 11-108.

FNS conducted a compliance review visit of the Store on July 23, 2013.  A.R. 11-48.  A cashier for the Store was present and consented to the store review.  A.R. 15.  At the visit, it was documented that the Store is located within a larger building and does not have optical scanners, shopping baskets, or shopping carts.  A.R. 11 and 24.   The Store had one cash register/check out station and one point-of-sale device for processing EBT transaction.  A.R. at 11.  The Store did not serve hot foods and foods for on-site consumption, but did have a deli or prepared food section containing prepared/made-to-order items and other refrigerated foods.  *Id.*   The Store did not offer meat or seafood specials or bundles.  *Id.*  The Store operated the cash register behind a plastic barrier, separating it and the operator of the cash register from the shopping area of the Store.  A.R. 12.  There was a small opening in the plastic barrier to allow transactions to occur, but there is also a freezer locate directly beneath the opening.  *See* A.R. 22, 24, and 35.  The reviewer documented the various dairy, fruit and vegetable, bread and cereal, and meat, poultry, and fish items that were available, as well as the amounts of each.  A.R. 13.  The reviewer made a sketch the layout of the public areas of the Store and took photos of interior and exterior of the Store.  A.R. 16-48.

---

[1] The Administrative Record, which consists of pages A.R. 1-A.R. 656, which has been filed as a separate docket entry.  Doc. No. 11.

The FNS analysis of the Store's EBT data for the months of July, August, September, October, November, and December of 2013 revealed a pattern of rapid and repetitive transaction in a short period of time from SNAP beneficiaries (47 sets of transactions where the repetitive transaction is less than 4 minutes from the previous transaction). A.R. 94-95. These transactions were deemed suspicious in light of the time required to process a legitimate purchase – cashier's handling of the individual items to determine price, manually keying the price into the cash register, bagging the items, and processing the transaction. A.R. 94. It also revealed a pattern of rapid and repetitive transactions in a short period of time from the same household/account. This pattern contained 104 suspicious, rapid transactions, in which a household's EBT card was used repetitively within a 24 hour period. A.R. 95-96. These transactions were considered suspicious because the clients identified had access to and shopped at much larger, better stocked stores which offered better overall value and selection. A.R. 96. Several of the households involved in these transactions made purchases at larger grocery stores within days of making multiple purchases at the Store. *Id.* The analysis also revealed a pattern of high dollar transactions, which were deemed excessively large for a convenience store. A.R. 96-97. The average convenience store transaction in Maryland during the review period was $8.51 while the Store had 300 transactions over $50.00 (3% of the Stores SNAP transactions during the review period). A.R. 96. Additionally, the Store's average SNAP transaction was $9.51, which is above the state average. A.R. 96-97. FNS deemed the large transactions suspicious because the store's layout and inventory did not support such a high percentage of transactions exceeding the average of similar stores. A.R. 97. FNS also examined the location of other SNAP authorized retailers within 3/4 of a mile of Plaintiff and determined that there were 85 authorized stores within that area (45 convenience stores, 6 combination stores, 22 small grocery stores, 10 medium grocery stores, 1 large grocery store, and 1 supermarket). A.R. 97.

FNS also compared the SNAP redemption amounts at the Store to the average for convenience stores located in Maryland and determine that Plaintiff's redemptions were much higher than the average. During the analysis period, the Store redeemed $93,662.31 in SNAP benefits in 9,849 transactions while the Maryland average for a convenience store was $23,936.87 total SNAP redemptions in 2,818 transactions. A.R. 98. The analysis revealed that the Store's average transaction totaled $9.51 while the average for convenience stores in Maryland was $8.51. *Id*. FNS found these numbers for the Store suspicious because the store visit demonstrated that the Store did not sell any unique items that cannot be purchased at other stores in the area. A.R. 99. The transaction data also included that households that shopped at the Store not only had access to, but also shopped at, larger and better stocked stores while at the same time exhibiting suspicious shopping patterns at the Store. A.R. 99-108.

C. Administrative Process

Following the analysis, Gilda Torres, the Section Chief of the Retailer Operations Division, sent a letter to Plaintiffs dated February 5, 2014 ("Charge Letter"). A.R. 109-111. This letter informed Plaintiffs that an analysis of the EBT transactions for the months of July, August, September, October, November, and December of 2013 established clear and repetitive patterns of unusual, irregular, and inexplicable activity for Plaintiffs' type of store A.R. 109. It further informed Plaintiffs that based on this information and analysis, the Store was being considered for a permanent disqualification from the program as a result of the trafficking charges, as defined by 7 C.F.R. § 271.2. The suspicious transactions were grouped into three categories: (1) a series of EBT transactions containing multiple transactions made too rapidly to be credible; (2) a series of EBT transaction containing multiple transactions made from individual benefit accounts in unusually short time frame; and (3) a series of EBT transactions containing excessively large purchase transactions from recipient accounts. A.R. 109. The suspicious transaction details were attached to the letter, broken down by pattern type. A.R. 111-

129.  The letter explained Plaintiffs' right to reply to the charges and to present "any information, explanation, or evidence regarding these charges" either in person or by phone to Nancy McCormick, an FNS employee, within 10 days of the receipt of the Charge Letter.  A.R. 110.  It also stated that the Store could request a civil money penalty ("CMP") in lieu of permanent disqualification.  In order to be eligible for the CMP, the Owner must present information, within 10 days of the receipt of the Charge Letter, that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i).  A.R. 109-110.  The Owner received the letter on February 7, 2014.  A.R. 130.

On February 12, 2014, FNS issued a "Credit Letter" to Plaintiffs in response to a telephone call with David Silbiger (attorney for Plaintiffs during the administrative process).  A.R. 132-133.  This letter memorialized the telephone conversation in which Attorney Silbiger stated that Plaintiffs extended credit to SNAP customers.  The letter informed Plaintiffs that SNAP regulations prohibited credit transactions, and that stores that engage in credit transactions shall be disqualified for a period of 1 year.  The letter went on to request information regarding the credit transaction, as well as any in response to the charges outlined in the Charge Letter within 10 days of receipt of the Credit Letter.  Plaintiffs received the Credit Letter on February 14, 2014.  A.R. 134.

In a letter dated February 21, 2014, Plaintiffs' counsel submitted a written response to the Charge Letter and Credit Letter.  A.R. 136-138.  Plaintiffs denied any involvement with trafficking, and "are therefore not subject to any of the penalties that could be imposed in the event thereof."  A.R. 136.  Instead, Plaintiffs stated, the suspicious transactions listed in the Charge Letter were the result of extending credit to customers, which Plaintiffs alleged they did not know was a violation of SNAP.  A.R. 136, 137.  Plaintiffs included copies of pages from two composition books, which Plaintiffs alleges were the records of the credit transactions.  A.R. 137, 139-340.  Plaintiffs also included 79 letters from customers "attesting to the value of the

continuation of the Perez Grocery to them and the community and the treatment by and service provided by the Perez Grocery and Mr. Mian." A.R. 137, 341-420. The letter concluded by stating that since Plaintiffs did not know that credit transactions were forbidden by SNAP, they should only receive a written reprimand or a probationary period. A.R. 138.

FNS analyzed the Store comparison data, which included a map of other stores located within 3/4 of a mile of the Store, and a breakdown of their transaction data. A.R. 421-422. FNS also attempted to match the customer letters to SNAP recipients. If there was a match, the Agency reviewed the shopping patterns of those recipients. A.R. 423-489. It was noted that the response to the Charge Letter and the Credit Letter did not individually address any of the transactions attached to the Charge Letter. A.R. 500. FNS then analyzed each of the suspicious patterns. In response to the first pattern, FNS found that there were 94 individual transactions grouped into 47 sets, where households completed rapid transactions in timespans ranging from 31 seconds to 4 minutes. FNS analyzed how a transaction could take place at the store where the cash register is behind plexi-glass with a small opening and limited counter space and no shopping carts or baskets and no optical scanner: the cashier must ring up the items, make room for more items to be placed on the counter, ring those items, separate any nonfood items, provide the customers with a total, swipe the EBT card, allow the customer to enter his or her PIN, wait for the transaction to be processed through the system, and bag the groceries. A.R. 501. Based on this setup, FNS determined it was unlikely that the Store would be able to conduct multiple transactions within seconds or minutes of each other. *Id.* Even if one of the transactions was a repayment of credit, it would still require consulting the credit ledger, finding the recipient's entry, calculating the balance, and recording the new balance. FNS also found that the ledger did not contain customers' full names, dates of purchases, recipient addresses, or itemized list of items purchased. It was also determined that it is unlikely that customers would spend significant amounts of benefits at a marginally stocked convenience store. *Id.*

In analyzing the rapid transactions from same households/accounts, FNS found that the Store has 104 suspicious rapid multiple withdrawals, totaling $8,143.28. A.R. 502. These rapid transactions ranged from within minutes to 24 hours of each other. FNS found that the total amounts charged to an individual household's card total amounts not supporting by the Store's eligible food stock and facilities. Additionally, many of these customers were also shopping at other area grocery stores, and as supermarkets and superstores, making it more suspicious that customers would choose to spend such high dollar amounts at the Store. *Id*. FNS found that it unlikely that credit transactions could explain these repetitive visits, because it was unreasonable that customers would visit the store solely to repay credit, then return hours later to shop for groceries. *Id*. Additionally, several customers had 3 or more visits a 24 hour window, one with 4 visits in 2 hours and 26 minutes. A.R. 502-503.

Finally, FNS reviewed the high dollar amount transactions and found there was no basis in the Store's layout or inventory to justify such purchases. The Store carried no ethnic or specialty foods, offered no price advantage or customer specials, and carried a limited amount of fresh produce or meats; it was a regular convenience store. A.R. 504.

The Agency reviewed the customer letters and, where possible, matched them with SNAP beneficiaries. In cases of matches, it reviewed the shopping patterns and found that these customers were also shopping at larger stores, but still inexplicably spending more or making repetitive trips to the Store. *See e.g.*, 509, 511-513, 515-517.

The Agency fully reviewed the ledger, but due to the lack of information, it could not verify the credit accounts against the suspicious transactions. A.R. 517-518. It was also noted that the Store's SNAP redemptions for February 2014, after receipt of the Charge Letter, decreased 37% from the month before. A.R. 519. Finally, the Agency found that the Store presented no information regarding its eligibility for a CMP in lieu of permanent disqualification. A.R. 519-520. As such, FNS concluded that the Store's response to the Charge Letter failed to

justify or explain the suspicious transaction data and, as such, the transaction represented trafficking. A.R. 520.

FNS issued a letter dated March 17, 2014 (the "Determination Letter"), which informed Plaintiffs that FNS found that the violations cited in the Charge letter had occurred at the Store. A.R. 521-522. As such, the Store was permanently disqualified from SNAP, effective upon receipt of the Determination Letter, unless Plaintiffs requested administrative review. A.R. 521. The Determination Letter informed Plaintiffs that FNS had considered their eligibility for a CMP and found that the Store was not eligible because Plaintiffs had failed to submit sufficient evidence demonstrating compliance with the CMP requirements. *Id.* Plaintiffs were advised of their appeal rights to the Agency's Administrative Review Branch ("ARB"), together with the contact information for the appeal and notification that the appeal must be filed within 10 days of receiving the Determination Letter. *Id.* Plaintiffs received the Determination Letter on March 18, 2014. A.R. 523.

Attorney Silbiger sent a letter to the ARB dated March 25, 2014 requesting administrative review of the trafficking determination. A.R. 524-525. In the letter, Plaintiffs again denied trafficking in SNAP benefits and stated that the permanent disqualification was unwarranted. A.R. 524.

On March 31, 2014, Administrative Review Officer ("ARO") Lorie Conneen sent a letter to Plaintiffs, through their attorney, to confirm receipt of Plaintiffs' request for an administrative review of the adverse action under the SNAP. A.R. 532. The letter also informed Plaintiffs that if they wished to submit any additional information, they must do so within three weeks of the date of receipt of this letter. *Id.* Plaintiffs' attorney received the letter on April 1, 2014. A.R. 534.

Plaintiffs, through Attorney Silbiger, submitted a letter containing additional information on April 11, 2014. A.R. 535-536. In the letter, Plaintiffs again denied trafficking and stated

11

there was no evidence to support that trafficking occurred. A.R. 535. Attached to the letter was an affidavit from Plaintiff Mian, affirming the facts in the letter, denying trafficking, and admitting to credit transactions. A. R. 537-538. Attached to the letter were 94 new letters from customers attesting to the credit transaction. A.R. 539-631.

By letter dated May 14, 2014, FNS informed Plaintiffs that their case had been reassigned to ARO Deborah Madorin, due to ARO excessive workload. A.R. 633.

On August 8, 2014, the Agency issued its Final Agency Decision ("FAD"), which concluded that the record indicated that there was sufficient evidence to support a finding that the permanent disqualification from participation in SNAP was appropriate. A.R. 638-654.

ARO Madorin stated that the issue on review was whether, through a preponderance of the evidence, it was more likely true than not true that the questionable transaction were the result of trafficking. A.R. 641. She then went on to summarize the evidence that comprised the Agency's case and concluded that the FNS Retail Operations Division had presented a *prima facie* case that the Store likely trafficked in SNAP benefits. A.R. 642-643, 653 (citing the EBT transaction data, the inadequacy of the Store's stock and facility to support such transaction as observed during the store visit, and the lack of adequate explanation for customers' spending habits given that there are other larger SNAP-authorized stores located within proximity to the Store). Regarding the transactions made too rapidly to be credible, she found that the documentation of the transactions could not logically be explained by credit transactions or by legitimate transactions, given the Store's layout, lack of counter space, lack of optical scanner, and lack of shopping carts and baskets. A.R. 645-646. She found the repetitive transactions in the same household/account similarly were not logical given the Store's eligible food stock and physical facilities. A.R. 646-647. Finally, the excessively large transactions ranging from $50.39 to $209.74 were not supported given the Store's layout and inventory, given that they markedly exceed the average transaction amount of similar SNAP authorized stores and the fact

that many large transactions were followed on the same day or within several days by purchases as full-sized supermarket. A.R. 647-649. Overall, she found it difficult to believe that SNAP recipients would prefer to spend limited SNAP benefits at a convenience store when they could use other larger food stores with carry a greater variety of foods at lower costs. A.R. 650.

ARO Madorin then reviewed the evidence presented by Plaintiffs and concluded that the claims of credit transactions did not demonstrate, by a preponderance of the evidence, that the disqualification should be reversed because trafficking is the most likely explanation. A.R. 652; see also, A.R. 644-651 (examining the credit explanation in each suspicious pattern). Further, as the Store did not qualify for a CMP in lieu of disqualification, the permanent disqualification was sustained. A. R. 653.

Plaintiff's right to appeal to Federal or State court was explained in the Final Agency Decision. *Id.* Plaintiffs, through their attorney, received the FAD on August 12, 2014. A.R. 656. Plaintiffs' Complaint, filed by Attorney Louis Glick, was filed in the U.S. District Court for the District of Maryland on September 5, 2014.

### III.    LEGAL STANDARDS

A.    Scope of Judicial Review

The Food Stamp Act provides for *de novo* judicial review of final agency actions in federal district court to "determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15). The statute accords the administrative action "a presumption of validity." *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir. 1975). In this judicial review proceeding, the plaintiff bears the burden of proof "to establish the invalidity of the administrative action by a preponderance of the evidence." *Warren v. United States*, 932 F.2d 582, 586 (6th Cir. 1991). The provision of *de novo* review "does not, however, *entitle* plaintiffs

to reach a trial on the merits of their cause of action." *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000) (emphasis in original). Rather, "Congress intended nothing more than that the district court would not be bound by the administrative record." *Redmond*, 507 F.2d at 1011. Accordingly, "it is clear that summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact." *Bon Supermarket & Deli*, 87 F. Supp. 2d at 599.

If the court concludes that a violation occurred, it then applies the "arbitrary and capricious" standard to determine whether the sanction imposed is valid; under this standard, the sanction will be upheld unless "it is unwarranted in law or without justification in fact." *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir. 1975). The Fourth Circuit has explained that the scope of review of the sanction imposed on one who violates the statute is much narrower than the scope of factual review. *See id.*; *Herling's Grocery Basket, Inc. v. United States*, 538 F.2d 86, 87-88 (4th Cir. 1976). Accordingly, "the views of the Secretary [of Agriculture] as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Cross*, 512 F.2d at 1218.

B.      Summary Judgment

Under Federal Rule of Civil Procedure 56(c), a court must enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has made clear that, "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

14

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Entry of summary judgment is appropriate "against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and the Supreme Court has instructed that Rule 56 "should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323-24.

In this case, there is no genuine issue of material fact in dispute, and Defendant is entitled to judgment as a matter of law.

IV.   ARGUMENT

In this case, the suspicious activity recorded by the EBT transaction tracking software automatically triggered a review of the Store's sales activity. After a careful and thorough examination of the EBT data, along with evidence obtained from a store visit, the Agency determined that Plaintiff violated SNAP regulations against trafficking. The evidence supports the Agency's conclusion that Plaintiff more likely than not engaged in trafficking. Accordingly, disqualification is the only appropriate sanction as a matter of law, as Plaintiff did not submit any evidence that it implemented a compliance program.

A.    The Record Demonstrates that Plaintiff Violated the Food Stamp Act by Engaging in Trafficking.

The Agency's final decision that the Store engaged in trafficking is supported by a preponderance of the evidence in the administrative record.  In the FAD, the USDA set forth ample evidence and analysis supporting its determination that Plaintiff committed trafficking violations under the Food Stamp Act.  A.R. 639.  Importantly, although Plaintiff seeks review of the Agency's ultimate determination, neither his complaint nor his prior submissions challenge the accuracy or the validity of the data on which the determination that trafficking occurred at the store was made.

As discussed above, the Agency identified three patterns of EBT transaction characteristics indicative of trafficking: (1)"multiple purchase transactions were made too rapidly to be credible;" (2)  "multiple transactions were made from individual benefit accounts in unusually short time frames;" and (3) "excessively large purchase transaction were made from recipient accounts"  A.R. 109.  In addition, store survey documentation and observations from the store visit showed that the Store is a typical "moderately stocked convenience store" with one cash register; no electronic scanners; one POS device; no shopping carts or hand-held baskets for customer use; and very limited counter space, as the counter area is partially enclosed in Plexiglass.  A.R. 11-12, 24.

In its final decision, the Agency explained in detail, and provided sufficient documentation to show, the basis for concluding that Plaintiff engaged in trafficking with regard to each of the three patterns of EBT transactions.

1. <u>Multiple purchase transactions were made too rapidly to be credible</u>

The Charge Letter documented 47 sets of transactions, involving one or two different households conducting back-to-back transactions within four minutes or less, that totaled $5283.36 in SNAP benefits. A.R. 112-117. The USDA included examples of these transactions in its FAD. A.R. 501-502. The Agency found Plaintiff's various explanations "not credible" because, especially with one cash register, "[i]t is vey unlikely that households would be able to conduct multiple transactions of eligible food items within seconds or minutes." A.R. 501. The USDA noted that it would be improbable even if one of the transactions was a payment on a credit account. *Id.* Furthermore, the USDA found it unlikely that "so many households would be spending such significant amounts of their SNAP benefits at this marginally stocked convenience store." *Id.* Thus, the multiple rapid transactions, more likely than not, indicates that trafficking occurred at Perez.

2. Multiple withdrawals were made from individual benefit accounts within unusually short time frames

The Charge Letter documented 104 transactions reflecting sets of multiple purchases from individual benefit accounts in unusually short time periods ranging from less than one minute to 24 hours, in amounts as much as $330.59. A.R. 109, 118-121. All together, these transactions totaled $8143.28 in SNAP benefits. A.R. 502. The Agency determined that the SNAP transactions set forth in the Charge Letter are questionable "because they are not supported by the store's eligible food stock and physical facilities." *Id.* Additionally, USDA found "[e]ven more suspicious and indicative of trafficking, a review of client shopping data for the review period shows[ed] that clients shopping at Perez Grocery [were] also shopping at other

17

area grocery stores." *Id.* This evidence and analysis, taken together, support the Agency's conclusion that, more probably than not, the subject transactions were illegitimate.

        3.  <u>Multiple Transactions at higher dollar amounts</u>

The Charge Letter documented 300 transaction during the review period which exceeded $50. A.R. 109, 124-129, 504. As the USDA noted, the average transaction amount at this store exceeded the average amount for a convenience store in Maryland during the same period by 11%. A.R. 504. The evidence and observations by the USDA during the review found that the high dollar amount of the transactions indicated several other indicators of trafficking. First, the USDA found it "questionable why SNAP customers would spend such significant benefit amounts" at this store where there was limited inventory, no specialty or ethnic foods, no special services, and a limited variety of fresh produce. *Id.* Second, USDA noted the proximity of other stores with better varieties as a reason to question to legitimacy of the transactions at Perez. *Id.* Third, USDA found that the layout of the store made it "not conductive to processing groceries other than small orders." *Id.* These factors all support the conclusion that, more probably than not, the subject transactions were illegitimate.

B.    <u>Reliance on EBT Data Is Appropriate to Make a Finding of Trafficking Violations.</u>

Congress authorized the FNS to disqualify a SNAP participant for failure to comply with the Food Stamp Act on the basis of, *inter alia*, "evidence obtained through a transaction report under an electronic benefit transfer system." 7 U.S.C. § 2021(a)(2); *see also* 7 C.F.R. § 278.6(a). The plain statutory language further demonstrates Congress' intent that purchasing electronic SNAP credits constitutes trafficking. Accordingly, courts have regularly upheld trafficking violations based upon documentary evidence generated from EBT data. *See, e.g., Idias v. United*

*States*, 359 F.3d 695, 698 (4th Cir. 2004) ("Congress expressly authorized the FNS to consider 'evidence obtained through a transaction report under an electronic benefit system' in disqualifying food stores for food stamp trafficking." (quoting 7 U.S.C. § 2021(a)); *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303-04 (S.D. Cal. 2000) (same). The FNS has acted on that authority by "issuing regulations that permit a food store to be disqualified from the Food Stamp Program on the basis of 'inconsistent redemption data' or 'evidence obtained through [an EBT] transaction report.'" *Idias*, 359 F.3d at 698 (citing 7 C.F.R. § 278.6(a)).[2]

In this case, as discussed in detail above, based on a thorough investigation and analysis of evidence generated from the EBT data at ANS, the Agency determined that Plaintiff engaged in trafficking, in violation of the Food Stamp Act. The Plaintiff has not demonstrated, in its prior submissions to the USDA, "a sufficient factual basis to permit a reasonable fact-finder to conclude that the specific irregularities listed in the EBT reports did not constitute trafficking." *AJS Petroleum, Inc.*, 2012 WL 683538 at *6 n.6. Plaintiff has not demonstrated that it can meet this burden now.

The courts have made clear that "[t]o survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation." *McClain's Market v. United States*, 214 Fed. Appx. 502, 505 (6th Cir. 2006) (emphasis in original). Plaintiff cannot do so here. Specifically, Plaintiff cannot generate a genuine issue of material fact with regard to the Agency's decision based on the analysis of the

_____

[2] As the Fourth Circuit has noted, "one of the advantages of replacing traditional paper food stamps with the EBT system was that it made it easier to detect trafficking, particularly in more closely-knit communities where undercover evidence can be difficult and costly to obtain." *Idias*, 359 F.3d at 698 (internal citation omitted).

EBT data and investigation, including the in-store visit. Accordingly, Defendant is entitled to summary judgment. *See Idias*, 359 F.3d at 699 (affirming summary judgment where United States supported decision to disqualify plaintiff from Food Stamp Program "with extensive documentary evidence of a pattern of food stamp trafficking"); *McClain's Market*, 214 Fed. Appx. at 505 (affirming summary judgment where plaintiff "has simply offered no evidence to explain the volume, frequency, or size of the transactions identified by the government").

C.      Summary Judgment is the Appropriate Disposition in this Case.

Summary judgment is a proper means of disposing of a request for judicial review and is not contradictory to the *de novo* trial provision of 7 U.S.C. 2023(a)(15) when there are no genuine issues of material fact. *Bon Supermarket v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000). "The *de novo* provision 'does not, however entitle plaintiffs to reach a trial on the merits of their cause of action.' Congress simply 'intended … [that the district court would not be bound by the administrative record.'" *Mahmood v. United States*, Civ. No. WMN-12-228 2012 WL 3038638 at *2 (D. Md. July 24, 2012) (granting summary judgment filed as a responsive pleading prior to discovery); quoting *Bon Supermarket*, 87 F. Supp. 2d at 598.

At trial, the court's review of FNS' decision to disqualify a store from SNAP is a two-part process. *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999); *Bon Supermarket v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000). First, the court determines whether the alleged violations of the Food Stamp Act occurred at the store. In this determination, the plaintiff bears the burden of showing by a preponderance of the evidence that violations of the Food and Nutrition Act of 2008 did not occur. *Redmond v. United States*, 507 F.2d 1007, 1010 (5th Cir. 1975); *J & M Food Store v. United States*, 897 F. Supp. 1126, 1130

(N.D. Ill. 1995); *Holmes v. United States*, 868 F. Supp. 1348, 1351 (M.D. Ala. 1994); see also *AJS Petroleum v. United States,* Civ. No. BEL-11-1085 2012 WL 683538 at *4 (D. Md. March 1, 2012); *Rodriguez Grocery & Deli v. USDA*, Civ. No. WDQ-10-1794, 2011 WL 1838290 at *3 (D. Md. May 12, 2011); *2341 E. Fayette St., Inc. v. United States*, JFM-05-974, 2005 WL 2373596 at *1 (D. Md. Sept. 26, 2005). This *de novo* review is not limited to the facts of the administrative record. *Ibrahim v. United States*, 834 F.2d 52, 53-54 (2d Cir. 1987) (district court "should not limit its consideration to matters previously appraised in the administrative proceedings") (citation omitted). If the court finds that the violations did occur, the court's review becomes more limited, and the court reviews the sanction imposed by FNS under the "arbitrary and capricious" standard typically applied to administrative determinations. *Willy's Grocery v. United States*, 656 F.2d 24, 26 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148 (1982); *E & L Food v. United States*, No. 98-cv-4339-RJD, 1999 WL 167719 (E.D.N.Y. 1999); *Hernandez v. Dept. of Agriculture*, 961 F.Supp. 483 (W.D.N.Y. 1997); *see Thakor v. United States*, 55 F.Supp.2d 1103, 1107 (D. Nev. 1999); *Carlson v. United States*, 879 F.2d 261, 263 (7th Cir. 1989) (distinguishing between review of violation and review of penalty); *see also AJS Petroleum*, at *4, citing *Cross v. United States*, 512 U.S. 1217, 1218 (4th Cir. 1975); *Mahmood v. United States*, at *2. "To be considered arbitrary and capricious, the agency's action must have been 'unwarranted in law or without justification in fact.'" *Willy's Grocery*, 656 F.2d at 26 (citations omitted); *Mahmood*, at *2; *Young Jin Choi v. United States*, 944 F.Supp. 323, 325 (S.D.N.Y. 1996).

Throughout this bifurcated review process, the Plaintiff bears the burden of proof. *Redmond*, 507 F.2d at 1010; AJS Petroleum, 2012 WL 683538, at *4. Thus, Plaintiff must prove

by a preponderance of the evidence that (1) the violations did not occur at Perez Grocery; or, if failing to disprove that violations occurred, (2) proving that the sanction imposed by the FNS was arbitrary and capricious; or (3) proving a violation of due process rights.

       1.   <u>Violations of the Food Stamp Act Occurred at Perez Grocery</u>.

Plaintiffs will not be able to meet its burden of proof that trafficking did not occur at the Store unless it can convincingly explain away each of the factors that led to the FAD in favor of disqualification. *Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004) ("a store that is caught trafficking in foods stamps even one time must be permanently disqualified."); *Traficanti v. United States*, 227 F.3d 170, 174 (4th Cir. 2000); *Mahmood*, at *3; *AJS Petroleum*, at *4 ("even one trafficking violation can support permanent disqualification from the program"). During the administrative process, Plaintiffs asserted that the Store did not engage in trafficking and asserted that credit transactions explained the suspicious transactions. As the administrative record as a whole demonstrated and, specifically as the FAD noted, Plaintiffs' evidence of credit transaction fails to provide explanations for any of the suspicious transactions as the Plaintiffs ledger did not contain full customer names, SNAP numbers, or transaction dates (for either the purchase or the repayment) so that the ledger entries could be checked against the suspicious EBT data. Additionally, the characteristics of the Store – the layout and inventory as discussed above – make it extremely unlikely that the transaction have a legitimate reason.

Even conceding that credit transaction could explain some of the suspicious transactions, it is highly unlikely that repayment of credit transactions explains why a customer visits the Store three or more times in a 24-hour period. *See* A.R. 502-503 (detailing four households that made three or four in less than 24 hours). Although the trial court is not limited to the evidence

already in the administrative record, it is unlikely that Plaintiffs will be able to significantly add to the evidence that it has already presented to the Agency in its defense, particularly as it is the Plaintiffs' burden to show by a preponderance of the evidence that each and every instance of trafficking in the violations did not occur. Therefore, the court should find that trafficking did occur and then address the second prong of its review and consider the sanction imposed by FNS, based upon the "arbitrary and capricious" standard. *Willy's Grocery*, 656 F.2d at 26; *E & L Food*, 1999 WL 167719 (E.D.N.Y. 1999); *see Young Jin Choi*, 944 F. Supp. at 325.

 2. The Decision to Disqualify Plaintiff from the SNAP Was Not Arbitrary or <u>Capricious.</u>

Under the Food Stamp Act and its implementing regulations, permanent disqualification is mandatory upon a determination of trafficking by the FNS. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). That is, trafficking is a strict liability offense. *See Traficanti v. United States*, 227 F.3d 170, 174-75 (4th Cir. 2000) ("Congress specifically intended that *all* owners be subject at least to some penalty, regardless of fault." (emphasis in original)); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy."). The Fourth Circuit has held that "the statute's strict liability regime is rationally related to the government's interest in preventing fraud" and, therefore, "[i]t is not the place of the judiciary to disregard the guidelines set by Congress." *Traficanti*, 227 F.3d at 175.

In this case, upon its determination that Perez had committed trafficking violations, the Agency was statutorily required to disqualify Plaintiff permanently from further participation in the SNAP. *See Traficanti*, 227 F.3d at 175 ("[Plaintiff's] permanent disqualification from the

food stamp program is well within the bounds of agency discretion.  Indeed, his permanent disqualification is mandated by the statute itself."); *Idias*, 359 F.3d at 697 ("[T]he FNS imposed precisely the penalty required by Congress: based on a pattern of suspicious EBT activity, the FNS disqualified the [plaintiff] from participating in the Food Stamp Program.").

The USDA appropriately imposed the penalty of permanent disqualification on Perez Grocery in accordance with the Food Stamp Act.  Thus, by definition, the Agency's penalty determination was neither arbitrary nor capricious, and it should be upheld by this Court. Accordingly, Defendant is entitled to summary judgment.

## V.    CONCLUSION

For the foregoing reasons, Defendant United States respectfully requests that the Court grant this motion, enter summary judgment in its favor and dismiss this case with prejudice.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

_____/s/_____
Thomas H. Barnard
Assistant United States Attorney
Federal Bar No. 27488
36 S. Charles Street
Baltimore, MD 21201
Thomas.barnard@usdoj.gov

Of Counsel
Virginia Henning
Attorney Advisor
USDA, Office of the General Counsel
228 Walnut Street
P.O. Box 1297
Harrisburg, PA 17108